# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | |
| v. | ) ) | Criminal No.   12-10318-RGS |
| **DARREN STOKES,** | ) ) ) | |
| **Defendant.** | ) ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits this memorandum in support of its sentencing recommendation and to address issues raised in the defendant Darren Stokes' ("Stokes") objections to the PSR.   The government agrees with Probation's calculation of the sentencing guidelines (TOL 25; CHC III), and recommends that Stokes be sentenced to a term of imprisonment within the 70-87 month applicable range.   The government also recommends that the Court sentence Stokes to 36 months of supervised release, that he be ordered to pay restitution in the amount of $1,170 and a mandatory special assessment of $1,500, and that the Court include in the sentence the Order of Forfeiture (Money Judgment) entered by the Court on November 10, 2014 (Dkt. #103).

## THE CHARGES AND STOKES' OFFENSE CONDUCT

From 2008 to 2012, Stokes caused fraudulent invoices seeking payment of annual dues or for inclusion in a directory to be faxed to businesses throughout the United States, purporting to be from existing legitimate business and trade associations, using the exact names and/or acronyms of the associations, or similar sounding names and/or acronyms.   Indictment at ¶¶ 2, 4 (Dkt #1).

1

Stokes carried out the scheme by purchasing or leasing lists of business fax numbers, then paying a company called Profax to "fax broadcast" fraudulent invoices using those numbers. Each list of fax numbers that Stokes used pertained to a particular type of business, such as building contractors, dental offices, manufacturing businesses, trucking companies, and health care businesses, among others.   The items that Stokes sent out were all one page documents which were either in the form of simple invoices or invoices combined with membership applications.   All sought payment of annual membership dues and/or inclusion in a directory, and all purported to have been sent from an existing national business or trade association.   The association that Stokes used for each fax broadcast corresponded to the type of business fax list he was using.   For example, the invoices sent to dental offices purported to have come from the American Dental Association ("ADA").   The other associations Stokes used included the National Association of Manufacturers ("NAM"), the American Parts Remanufacturers Association ("APRA"), the American Trucking Association ("ATA"), the Associated General Contractors of America ("AGC"), and the American Hospital Association ("AHA").   Each invoice Stokes sent out included the acronym of an existing association, as well as either its real name or a slight variation of it; e.g., "National Manufacturers Association" rather than the "National Association of Manufacturers."   Each invoice directed that payment be mailed to an address in Massachusetts at which Stokes received mail.   Many of the invoices sought payment in the $475-685 range, although some were for as little as $75, while others sought more than $1,000.[1]

Exhibit 1 contains copies of some of the invoices Stokes caused to be sent.   The first few

---

[1] This paragraph is part of what the government included in its oral statement of evidence at Stokes' plea hearing, to which Stokes admitted without objection.

pages of Exhibit 1 are comprised of the most recent invoices Stokes used and which form the basis of the specific mailings and wires charged in the Indictment. The invoices Stokes used in the earlier years of his scheme (2008-2011), while in slightly different form, were sent for the same purpose as the later ones: to deceive the recipients into sending him checks by requesting payment of annual dues and/or inclusion in a directory by using names and initials deceptively similar to legitimate business associations.[2]

There is no question that Stokes never intended to establish any real business association or provide any services – including any directories – to the businesses which sent him money. In fact, at the same time in 2010 when Stokes was sending out deceptive faxes and requesting that businesses send him their membership dues checks made payable to a variety of entity names, such as "N.A.G.C.," or "American General Contractors Directory, Inc.," or "General Contractors & Home Builders," or "AGC Association," or "National Hospital Association, Inc.," or "A.H.A. Association" (see Exhibit 1), he was also asserting in sworn bankruptcy filings that he had no interest in any business, partnership or joint venture, and that in the prior several years he had not operated a corporation or partnership, or any business as a sole proprietor, or been self-employed in any trade. Exhibit 2 (Stokes' Bankruptcy Schedules; Schedule B ¶¶ 13-14); Exhibit 3 (Stokes' Bankruptcy Statement of Financial Affairs ("SOFA") ¶18). Stokes filed his Chapter 7 bankruptcy in September 2010, at about the mid-point of his fraudulent scheme. Exhibit 4 (Bankruptcy Petition). His bankruptcy filings reflect Stokes' financial situation at that time, and highlight the fact that there was nothing legitimate about any of the faxes he sent. They show that in late 2010, Stokes was unemployed, that he had received no income in 2009

---

[2] The Virginia District Court's decision, relied on by Stokes, which found that his faxes were not technically "counterfeit" under the Lanham Act, is irrelevant to whether they were part of his scheme to defraud.

and 2010 other than unemployment benefits, that he had no bank accounts or any other assets of value, and that he was burdened both by a mortgage which far exceeded the value of his home and by nearly $50,000 in unsecured debt.   Exhibits 2-3.

### Stokes cashed the checks he received from his scheme

Because Stokes had no bank account and was not engaged in any legitimate business enterprise, between September 2009 and February 2012, he used a check cashing service to negotiate at least 567 checks totaling $213,335 which he obtained as part of this scheme. Exhibit 5 contains an 11-page Customer Information Report, which is a list of checks cashed by Stokes during that time, produced by the now-defunct United Check Cashing.[3]   United Check Cashing's records reflect that Stokes cashed thirteen checks in the amount of $895.00 ($11,635), 228 checks in the amount of $575.00 ($131,100), 109 checks in the amount of $475.00 ($51,775), 34 checks in the amount of $150.00 ($5,100), and 183 checks in the amount of $75.00 ($13,725).[4]   Thus, the actual loss that Stokes' scheme caused to more than 500 individual businesses was no less than $204,935.[5]   Exhibit 5 also contains copies of several of the checks Stokes presented to United Check Cashing to be cashed, but which were returned because payment was stopped.   These remove any doubt that Stokes was using United Check Cashing to negotiate the checks he received from his scheme.[6]

---

[3] No records were produced for any earlier period.   A copy of this list and all other documents produced by United Check Cashing was turned over to Stokes during automatic discovery.
[4] United Check Cashing's records do not reflect the identity of all the check issuers.   However, the information contained in its records is generally consistent with the types of businesses which Stokes solicited for dues payments. Moreover, the *amount* of each such check is accurately reflected in United Check Cashing's records, and those amounts correspond exactly with the dues amounts sought by Stokes in his fraudulent invoices. See Exhibit 1.
[5] This amount takes into account the sixteen checks totaling $8,400 which United Check Cashing's records reflect were returned, mostly because of stop payments ordered by the issuers.
[6] United Check Cashing did not retain copies of checks which were successfully negotiated.   Not all of the returned

4

**Stokes caused large numbers of fraudulent faxes to be sent**

The information available concerning the total number of invoices Stokes caused to be faxed during the course of his scheme is limited, but it suggests that the number is quite large. Documents produced by the company FaxVantage show that Stokes purchased lists of business fax numbers from 2008 to 2012 – for contractors, real estate agencies, and dental offices – containing a total of more than 400,000 fax numbers.  Exhibit 6.  Profax records reflect that in early 2012, Stokes caused Profax to send out at least 13,950 ADA invoices, 1,020 NAM invoices, and 377 APRA invoices.[7]  Exhibit 7.  About 500 envelopes sent in response to those 2012 faxes were intercepted before they could be delivered to one of Stokes' addresses.  PSR ¶24.  They included 443 envelopes addressed to the ADA each apparently containing a $575.00 check (for a total of $254,725), 32 envelopes addressed to NAM (at $575.00 each, for a total of $18,400), 10 envelopes addressed to APRA (at $585.00 each, for a total of $5,850), and 14 addressed to ATA (at $685 each, for a total of $9,590).  Id.  Together, these total $288,565. Copies of the envelopes,[8] most of which remain unopened, are attached as: 1) Exhibits 8 and 9 (envelopes addressed to ADA or some variation thereof, and numbered DKS00011, 35, 47, 52, 325-458, and 489-801);[9] 2) Exhibit 10 (envelopes addressed to NAM, or some variation thereof, and numbered DKS000460-488); and 3) Exhibit 11 (envelopes[10] addressed to ATA, APRA, or some variation thereof, and numbered DKS000064, 69, 74, 79-88, and 109-115).

---

checks are included in this exhibit, but all were produced to Stokes in discovery.
7 Copies of these and all other documents which the government obtained from Profax were produced to Stokes in automatic discovery. Profax did not provide records reflecting how many ATA invoices were sent.
8 Copies of all these envelopes were produced to Stokes in automatic discovery, and the original made available for inspection.
9 The bates-numbers were those given documents produced to Stokes in discovery.
10 The government has only copies of most of this group, since the originals were returned to the senders.

## SENTENCING GUIDELINES

The government agrees with Probation that the base offense level is 7 (USSG §2B1.1(a)(1); PSR ¶33), that the loss caused by Stokes' offense is greater than $400,000 but less than $1million, for a 14 level increase (USSG §2B1.1(b)(1)(H); PSR ¶34)); and that there should be a 6 level increase because there were 250 or more victims (USSG §2B1.1(b)(2)(C); PSR ¶35).

### Loss

As described above, and discussed in more detail in the government's PSR objection, Stokes caused checks totaling nearly $500,000 to be sent to him as a result of his fraudulent scheme, although he received and negotiated only about $204,000 since many others were intercepted before they could be delivered. The Court of Appeals has, in two recent cases, defined "intended loss" from both a subjective and objective perspective. United States v. Ledee, 772 F.3d 21, 38 (1st Cir. 2014) (defining it as "the loss the defendant reasonably expected to occur at the time he perpetrated the fraud."); United States v. Pennue, 770 F.3d 985, 992 (1st Cir. 2014) (defining it as "a loss that would have been expected by an objectively reasonable person in the defendant's position at the time of the fraud."). Based on the fact that Stokes' scheme caused businesses to send him checks totaling about $500,000, the Court can safely conclude that Stokes intended a loss of between $400,000 and $1 million. As Probation notes, this is a conservative figure since the loss could have been much greater had more businesses actually been deceived. PSR at pg. 33.

### Number of victims

Probation also correctly concludes that Stokes should receive a 6 level enhancement, pursuant to USSG §2B1.1(b)(2)(C) because there were more than 250 victims of his scheme. PSR ¶¶ 26, 35. As described above, Stokes cashed more than 550 checks obtained through his

fraudulent scheme, thus causing an actual financial loss to each.[11]

### Acceptance of responsibility

Stokes' guilty plea qualifies him for a two-level reduction for acceptance of responsibility, pursuant to USSG §3E1.1(a).  However, because Stokes did not notify the government of his intention to plead guilty until less than two weeks before the scheduled trial date, by which time the government had already expended considerable resources in preparing this case for trial, the government does <u>not</u> intend to file the motion for an additional one level reduction, pursuant to USSG §3E1.1(b).

### 3553(a) factors

### Specific deterrence and protection of the public

The most important factors in imposing sentence in this case are the need for specific deterrence and to protect the public from further crimes of the defendant.   This was not an impulsive crime, but one carried out with thought over a period of at least four years.   Stokes also pursued his scheme despite efforts by at least two of the business associations to get him to stop by sending Stokes cease and desist letters.   PSR ¶¶ 12-13; Exhibits 12 and 13.   Stokes even responded in both instances, and represented that he would stop.   <u>Id</u>.   But despite those representations, and Stokes' implicit acknowledgement that what he was doing was wrong, he continued his fraudulent scheme for several more years.

Stokes was also subject to more formal civil actions, but that did not stop him either.   In late 2010, the United States Postal Service brought an administrative complaint against Stokes. PSR ¶14; Exhibit 14.   Stokes settled and consented to entry of a cease and desist order, but still

---

[11] Because the information about those victims provided by United Check Cashing is very limited, the government has been unable to specifically identify them for purposes of ordering restitution.

continued sending out fraudulent faxed invoices.  Id.  In 2011, the AGC filed a federal civil lawsuit against Stokes for sending fraudulent faxes using names similar to AGC's.  PSR ¶15.  But again, that did not deter Stokes from continuing.  In fact, the only thing that brought Stokes' scheme to an end – at least temporarily - was his arrest in this case.

But even his indictment and arrest did not stop Stokes from committing fraud.  After being released on bail in this case, Stokes obtained employment at a warehouse working for a temporary agency.  PSR ¶2, 97; Exhibit 15 (Motion to Revoke Release).  But instead of simply doing his job, Stokes defrauded his employer by submitting time sheets fraudulently claiming more than 500 hours that he did not in fact work.  Id.  The employer was thereby defrauded of more than $5,000 in wages that it paid to Stokes.  Id.  Moreover, Stokes lied to Probation about his employment.  Id.[12]  In sum, Stokes has shown by both his long-term scheme and his more recent post-indictment conduct that he is likely to recidivate and cause further harm to the public.  Only a significant prison sentence can send the message to Stokes that he needs to stop.

### Other factors

A significant sentence is necessary because this is a serious offense which involved the deception of more than 1,000 small businesses nationwide, and caused legitimate business associations to expend efforts and funds to try, unsuccessfully, to get Stokes to stop.

While Stokes is likely to focus on his troubled upbringing in seeking a sentence below the guideline range, there is no apparent correlation between his difficult childhood and his current lengthy offense conduct, nor does it offer any excuse for it.  To the contrary, the PSR reflects that Stokes has some post-high school education and has had legitimate employment in a variety

---

[12] Stokes now claims those violations were "unproven," but when he was given an opportunity to contest them at the time, he declined to do so and instead consented to revocation.  Dkt. #26.

of different jobs.  PSR ¶¶ 95, 101, 103.  Stokes' recent history reflects that he has made knowing decisions to support himself by fraud rather than seeking and maintaining legitimate employment.

## **CONCLUSION**

A sentence within the 70-87 guidelines range is appropriate to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.   In addition, such a sentence would afford adequate deterrence to Stokes, as well as others who might decide to commit similar types of offenses.   The government also recommends that the court impose a fine at or near the low end of the applicable guidelines range, restitution in the amount of $1,170 (PSR ¶ 126a), 36 months of supervised release, a mandatory special assessment of $1,500, and an Order of Forfeiture (Dkt. #103).

Dated: March 20 , 2015

                                            Respectfully submitted,

                                            CARMEN M. ORTIZ
                                            United States Attorney

                                     By: */s/ Mark J. Balthazard*
                                        MARK J. BALTHAZARD
                                        BBO # 544463
                                        Mark.Balthazard@usdoj.gov
                                        DOREEN M. RACHAL
                                        BBO #667837
                                        Dorren.Rachal@usdoj.gov
                                        Assistant U.S. Attorneys
                                        1 Courthouse Way, Suite 9200
                                        Boston, MA 02210
                                        (617) 748-3100

CERTIFICATE OF SERVICE

      I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

Dated: March 20, 2015

                                    */s/ Mark J. Balthazard*
                                    MARK J. BALTHAZARD